Filed 9/11/24  Monterey Peninsula Taxpayers' Assn. v. The Monterey Peninsula Water Management Dist. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MONTEREY PENINSULA TAXPAYERS' ASSOCIATION, INC. et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> THE MONTEREY PENINSULA WATER MANAGEMENT DISTRICT, <br><br> Defendant and Appellant. | H051128 <br> (Monterey County <br> Super. Ct. No. 21CV003066) |

This appeal involves two water charges levied by the Monterey Peninsula Water Management District (District), a public agency that manages water and supplies it to property owners in its jurisdiction.  To deliver water, the District uses a water distribution system owned by California American Water (Cal-Am), a privately owned public utility.  Cal-Am also supplies water to property owners in the District from Cal-Am's own sources using its water distribution system.

Between 1983 and 2009, most property owners in the District paid a fee (referred to in this appeal as the "user fee") to the District to support water distribution.  The user fee appeared as a line item on property owners' Cal-Am invoices.  After collecting the user fee, Cal-Am would remit it to the District.  In 2009, for reasons explained in more

detail below, the Public Utilities Commission (PUC) directed Cal-Am to stop collecting the user fee.

In order to replace the revenue previously generated by the user fee, in 2012 the District enacted Ordinance No. 152 (ordinance 152), which allows it to collect a different fee (referred to in this appeal as the "water supply charge") that appears on property owners' property tax bills. In order to secure public support for the ordinance, the District included language promising to "sunset" the water supply charge under specified circumstances. For purpose of this appeal, the key language reads, "Notwithstanding any other provision of this [o]rdinance, the District shall not collect a water supply charge pursuant to this [o]rdinance . . . to the extent alternative funds are available via a charge collected on the [Cal-Am] bill."

In 2017, the PUC authorized Cal-Am to resume collecting the user fee on behalf of the District by including it as a line item on Cal-Am's bills. Although funds again began flowing to the District from the user fee, the District did not alter the water supply charge. The question posed in this appeal is whether the District's refusal to reduce or terminate the water supply charge violates the sunset provision of ordinance 152.

In 2021, the Monterey Peninsula Taxpayers' Association, Inc. and Richards J. Heuer III (collectively, Association) filed a petition for writ of mandate in the trial court seeking elimination of the water supply charge or, alternatively, its proportional reduction by the amount of funds generated by the user fee. The trial court granted the Association's petition and ordered the District to pro rata reduce the water supply charge for every dollar collected through the user fee.

The District appeals, contending the Association's petition was untimely under section 118-412 of the Water Code Appendix[1] and section 860 et seq. of the Code of

---

[1] Unspecified statutory references are to this uncodified law as reprinted in West's Annotated Water Code Appendix. "Much of California's water law is comprised of

Civil Procedure, because the water supply charge is a "special assessment" that the Association did not timely challenge. In the alternative, the District asserts that its continued collection of the water supply charge does not violate the sunset provision of ordinance 152.

For the reasons set forth below, we reject the District's arguments and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND[2]

A. *Facts*

The District manages and regulates water use and distribution in the Monterey Peninsula area pursuant to the Monterey Peninsula Water Management District Law (District Law), enacted in 1977. The Legislature created the District out of concern that Cal-Am "did not have 'the ability to perform functions which are normally performed by public agencies,' including, among other things, the 'management and regulation of the use, reuse, reclamation, conservation of water and bond financing of public works projects.' " (*District v. PUC*, *supra*, 62 Cal.4th at p. 695; see also § 118-2.) The District "operates in the same geographical region" as Cal-Am (*District v. PUC*, at p. 695) and contracts with Cal-Am to supply water service to property owners in the District's

'uncodified acts,' also known and referred to as the 'Water Code Appendix.' " (Legislative Intent Service, Inc. California Water Code Statutory History, http://www.legintent.com/california-water-code-statutory-history, Sept. 8, 2017.)

[2] We take these undisputed facts from *Monterey Peninsula Water Management Dist. v. Pub. Utilities Com.* (2016) 62 Cal.4th 693 (*District v. PUC*) and from the matters of which the trial court took judicial notice. In addition, in April 2018, a different panel of this court affirmed the trial court's denial of the Association's referendum petition challenging ordinance 152. (*Monterey Peninsula Taxpayers' Ass'n v. Bd. of Dirs. of the Monterey Peninsula Water Mgmt. Dist.* (Apr. 11, 2018, H042484) [nonpub. opn.] (hereinafter, referendum appeal).) The California Rules of Court authorize reference to unpublished California opinions in only a narrow set of circumstances not applicable here. (See Cal. Rules of Court, rule 8.1115(b)(1).) However, we may cite to this unpublished decision to explain the factual background of the case. (*Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10.)

jurisdiction. (Referendum appeal, *supra*, at p. *2.) The District's jurisdiction includes properties connected to Cal-Am's main water distribution system, as well as properties connected to the Bishop, Chualar, Hidden Hills, and Ralph Lane subsystems.

Between 1983 and 2009, the District imposed on Cal-Am customers a user fee, which appeared as a line item on Cal-Am customer water bills and which Cal-Am collected and remitted to the District. (*District v. PUC*, *supra*, 62 Cal.4th at p. 696.) The user fee revenues funded the District's work mitigating environmental damage caused by Cal-Am's water supply activities.[3] (*Ibid*.)

The District "works in collaboration with Cal-Am on various projects to maintain and augment water supplies to the area. Two of those are the [a]quifer [s]torage and [r]ecovery project (ASR), which allows the diversion of excess water from the Carmel River to the Seaside Basin, and the [g]roundwater [r]eplenishment [p]roject (GWR), which is designed to increase the water supply from the Seaside Basin by injecting it with treated wastewater purchased from a local treatment plant." (Referendum appeal, *supra*, at p. *2.)

In 2009, Cal-Am applied to the PUC for "approval for a rate increase in the Monterey Peninsula area." (*District v. PUC*, *supra*, 62 Cal.4th at p. 696.) Although the PUC approved the rate increase, "it raised a number of questions about the District's user fees." (*Id*. at p. 697.) Cal-Am, the District, and the PUC's Office of Ratepayer

_____

[3] "In 1995, the State Water Resources Control Board (the Water Control Board) determined that Cal-Am was diverting more water from the Carmel River than either its licenses or the common law entitled it to divert. [Citation.] The Water Control Board imposed limits on Cal-Am's future use of Carmel River water. It further charged Cal-Am with responsibility for the so-called [m]itigation [p]rogram, a program started by the District in 1991 as a five-year program to mitigate the environmental impacts of low streamflow in the Carmel River. [Citation.] The Water Control Board ordered Cal-Am to continue the [m]itigation [p]rogram in the event the District ceased implementing the program at the end of the designated five-year term." (*District v. PUC*, *supra*, 62 Cal.4th at p. 696.) The District continued to implement the mitigation program after the end of the five-year period. (*Ibid*.)

Advocates filed a motion with the PUC seeking "approval of a settlement agreement under which all moving parties agreed that the District's requested user fee was appropriate." (*Id*. at pp. 697–698.) The PUC rejected the settlement agreement in March 2011 and decided that Cal-Am could no longer collect the user fee from its customers. (*Id*. at p. 698.) At the time of that decision, the user fee was "set at 8.325 percent of each Cal-Am customer's water charge" (*id*. at p. 696) and user fee revenues represented approximately 46 percent of the District's budgeted revenues. (See referendum appeal, *supra*, at p. *2.) The District challenged the PUC's decision in the California Supreme Court. While that appeal was pending, the District considered ways to replace the lost user fee revenues and to fund additional water supply projects.

In 2011, the District began to develop plans for a fee or charge to replace the user fee. The District sought guidance from its counsel on its authority to impose rates and fees for the provision of the District's "services, facilities or water" and the process it must follow to do so. Its counsel concluded that the District was authorized to impose such rates and fees pursuant to section 118-326 and article XIII D of the California Constitution, and the proposed water supply charge was "not a tax or an assessment," but, rather, a fee under article XIII D.

In April 2012, the District's general manager, David Stoldt, recommended that the District replace the user fee revenues by imposing a water supply charge in accordance with the terms set forth in ordinance 152, the initial draft ("[f]irst reading") of which was provided to the District's board. The District intended to levy the water supply charge "only against Cal-Am main system users" and it "exempt[ed] the Hidden Hills, Bishop, Ambler, and Toro Cal-Am sub-units" from the charge.[4] The District also noted that

---

[4] The District explained that the Hidden Hills and Bishop sub-units would be exempted "because they are not connected to the [Cal-Am] main system," whereas the Ambler and Toro sub-units are both "not connected to the [Cal-Am] main system" and "outside the District boundaries."

customers of the Seaside Municipal Water System, who were not impacted by the PUC's 2011 decision and had continued to pay the user fee to the District, would not be subject to the water supply charge.

In findings associated with proposed ordinance 152, the District explained that the proceeds from the water supply charge were intended to cover the cost of building, maintaining, repairing, and facilitating water supply projects, including the ASR and GWR projects, as well as to "ensure sufficient water is available for present beneficial use or uses." The findings identified the ASR and GWR projects as among the projects "necessary to ensure sufficient water is available for present beneficial water use in the main [Cal-Am] [w]ater [d]istribution [s]ystem" inasmuch as they "will increase water available to the main [Cal-Am water distribution system]." The District determined that the proposed water supply charge "constitute[d] a charge as a monetary imposition for the use of a commodity or service consistent with *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 and consistent with the provisions of [a]rticle XIII D, § 6(a) of the California Constitution."

The District set a public hearing on June 12, 2012, pursuant to article XIII D, section 6 of the California Constitution.[5] During the public hearing, the District informed attendees that the water supply charge was intended to fund only water supply activities, would be subject to an annual review by the board of directors, would sunset if the purpose for the fee expires, and was a fee incident to property ownership. It also accepted and tabulated protests as required under article XIII D, section 6.[6] (Art. XIII D, § 6, subd. (a)(2).)

---

[5] Unspecified article references are to the California Constitution.

[6] Ordinance 152 states that the implementation of the water supply charge is not subject to voter approval under article XIII D, section 6, subdivision (c) of the California Constitution "[b]ecause th[e water s]upply [c]harge is a property-related charge for water service, as that term is defined by law."

6

The District received over 10,000 valid protests to the proposed ordinance and water supply charge. Although the number of valid protests fell short of a majority of the affected parcels within the District, the District continued the hearing to June 19, 2012, and then to June 27, 2012. The District held meetings with representatives of the impacted community and identified areas of potential compromise, including "[s]tronger '[s]unset' [p]rovisions" and the addition of a "Citizen's Advisory Panel."

The District revised ordinance 152 in response to community concerns and adopted it on June 27, 2012. The ordinance took effect on July 1, 2012. Pursuant to resolution no. 2012-06, adopted concurrently, the District began collecting the water supply charge. Among other provisions, ordinance 152 included a sunset provision that stated, in pertinent part, that "Notwithstanding any other provision of this [o]rdinance, the District shall not collect a water supply charge pursuant to this [o]rdinance: . . . (b) to the extent alternative funds are available via a charge collected on the [Cal-Am] bill."

In connection with the adoption of ordinance 152, the District published a frequently asked questions (FAQ) document, which it updated in July 2012, regarding the water supply charge. In the FAQ, the District discussed the applicability of Proposition 218 to the water supply charge.[7] It concluded that, under Proposition 218, the water

The District reaffirmed its position during a board of directors meeting in April 2016. A representative of the Association raised concerns discussed in the referendum appeal regarding the District's imposition of the water supply charge without a vote of the District's electorate. The District's counsel responded that "a vote is only required if a project would benefit water users in a specific zone. In that case, an election would be held within the benefited zone. A project that would provide a common benefit to water users in the . . . District does not require a public vote." (Italics omitted.)

[7] "Proposition 218, approved by voters in 1996, added articles XIII C and XIII D to the California Constitution and 'is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees.' " (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1021, fn. omitted (*KCSFV*).) Proposition 218 "impose[d] both procedural and substantive limitations on an agency's ability to impose a special assessment." (*Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1521.) We discuss Proposition 218 in more detail, *post*. (See pt. II.A.2.)

7

supply charge is "a 'fee' " that " 'may be imposed by an agency upon a parcel or upon a person as an incident of property ownership, including user charges for a property-related service.' " Given the public concerns regarding the original sunset provision in the proposed ordinance, the District also summarized the conditions for sunsetting the water supply charge: "The rate ordinance specifies that the fee will be required to sunset when the purpose for the fee no longer exists. The Board will hold a public hearing each year to review collection and expenditures related to the fee's purpose, at which time the Board may elect to decrease or eliminate the fee as required. The rate ordinance also specifies that the District shall not collect a water supply charge in 2018-19, or any subsequent year, if no project is identified and underway by Dec. 31, 2017. Additionally, no supply charge shall be collected if alternative funds become available via a charge on the Cal Am bill."

In January 2016, the California Supreme Court set aside the PUC's 2011 decision that had prohibited Cal-Am from collecting the user fee.[8] (*District v. PUC*, *supra*, 62 Cal.4th at p. 702.) In March 2016, the District adopted resolution no. 2016-05, reestablishing the user fee pursuant to its authority under section 118-326. During a District meeting on April 2016, the District acknowledged that the sunset provision in section 10.C(b) of ordinance 152 required the sunset of the water supply charge " 'to the extent alternative funds are available via a charge collected on the [Cal-Am] bill.' " However, Stoldt and the District's chief financial officer recommended that the District collect both the water supply charge and the user fee "for at least 3 years" because: (1) the user fee revenues would fund District conservation and mitigation projects "so

---

[8] The California Supreme Court determined that, although the PUC had jurisdiction over public utilities, such as Cal-Am, it did not have jurisdiction over public agencies, such as the District, or agency-originated fees and charges. (*District v. PUC*, *supra*, 62 Cal.4th at pp. 699–700.) Our high court decided that, since "the user fee at issue originated with the District, not Cal-Am" (*id*. at p. 701), the PUC "may not treat an agency-originated charge as a utility surcharge merely because the agency is performing work that fulfills a utility's legal responsibility." (*Id*. at p. 702.)

there is little 'new' revenue"; (2) the referendum appeal remained pending, which meant that the water supply charge revenues "remain[ed] at risk"; (3) the District still had "large near-term expenditures" planned for water supply projects; and (4) Cal-Am's "recent history of significant revenue undercollection" rendered the user fee revenues unpredictable. They also suggested that the District levy "only a single [District] [u]ser [f]ee [s]urcharge on [the] Cal-Am bill, instead of a mitigation surcharge, a conservation surcharge, and the [u]ser [f]ee," and "[c]apture" "the existing [c]onservation [s]urcharge and [m]itigation [p]rogram expenses" in the District's "[u]ser [f]ee budget."

In October 2016, the District adopted resolution no. 2016-18, ordering Cal-Am to once again collect the user fee from its customers and remit the proceeds to the District. The collection was delayed until 2017, when the PUC issued Decision 17-01-013, authorizing Cal-Am to resume collection of the user fee from its customers within the District and remit the user fee proceeds to the District.

The District did not sunset any portion of the water supply charge, and its budgets from 2017 through 2022 assumed the continued collection of the water supply charge. When the District adopted its budget for fiscal year 2021–2022, it concurrently adopted resolution 2021-06, which requested the Monterey County auditor-controller to "enter those general or special taxes, assessments, or property-related [f]ees or charges identified in [e]xhibit 'A' on the tax roll for collection" for fiscal year 2021–2022. Exhibit A to resolution 2021-06 does not list any charges under the general taxes, special taxes, and assessments categories but does include the annual water supply charge under the property-related fees and charges category.

The notes to the District's financial statements between fiscal year 2017–2018 and fiscal year 2021–2022 indicate that its governmental funds are divided into three

9

operating funds: the water supply fund, the conservation fund, and the mitigation fund.[9] The District's funds are classified as nonspendable, restricted (externally imposed restrictions or restrictions imposed by law), committed (amounts that can only be used for specific purposes due to constraints imposed by the District's board), assigned (amounts constrained by the District's intent to be used for specific purpose but that are neither restricted nor committed), or unassigned (residual classification). In its financial statements, the District classified its project expenditures as "assigned" governmental funds.

The District's revenues from the user fee exceeded its revenues from the water supply charge in each of fiscal years 2017–2018 through 2021–2022. The user fee revenues and water supply charge revenues remained relatively consistent across those fiscal years: The District collected a total of $4 million to $5 million annually in user fee revenues and $3.3 million to $3.4 million annually in water supply charge revenues.

The District allocated water supply charge revenues entirely to the District's water supply operating fund from fiscal year 2017–2018 through fiscal year 2021–2022.[10] For fiscal year 2017–2018, the user fee revenues were allocated solely to the District's mitigation and conservation operating funds. However, commencing with fiscal year 2019–2020, the District allocated user fee revenues across the District's mitigation, conservation, and water supply operating funds.

---

[9] The District provided its financial statements and accompanying notes to its auditor at the end of each fiscal year in order for the auditor to perform an independent audit and prepare a comprehensive annual financial report. The District "assume[d] full responsibility for the completeness and reliability of the information contained in" the comprehensive annual financial reports, including the financial statements and accompanying notes.

[10] In its budgets, the District defined the term "[w]ater [s]upply [c]harge" as "a rate or charge that funds costs related to the provision of water," including costs to support the ASR and GWR projects "and related water supply purposes for the general benefit of the District as a whole."

B. *Procedural History*

On September 28, 2021, the Association filed a petition for writ of mandate and complaint for declaratory relief challenging the District's continued collection of the full amount of the water supply charge despite the reinstitution of the user fee.

The District demurred, alleging, among other claims, that the Association's petition was time-barred because the water supply charge is a " 'special assessment' " and, therefore, subject to validation under section 118-412. Since the District approved its annual resolution placing the water supply charge on the tax roll on June 21, 2021, the District contended that the Association's petition was untimely. The trial court overruled the District's demurrer, concluding that the validation statutes did not apply because the water supply charge is not a " 'special assessment.' "

Following a hearing and argument, the trial court granted the Association's petition for writ of mandate and request for declaratory relief. The court determined that the plain language of section 10.C(b) of ordinance 152 mandated that, "once Cal-Am began collecting the [u]ser [f]ee again, the District was able to use the funds from that fee because those funds were both present and accessible." While the trial court acknowledged that "the District has chosen in its discretion to retire certain surcharges and use the proceeds from the reinstated [u]ser [f]ee for other purposes," it reasoned that "this does not render those funds *unable* to be used." The court ordered the District to discontinue its "imposition and collection of the [w]ater [s]upply [c]harge by the amount of the [u]ser [f]ee." Elaborating on this point, the trial court decided "[i]n the context of the Sunset Provision, the reasonable construction of 'to the extent' is that there will be a pro rata reduction of the [w]ater [s]upply [c]harge for every dollar that is collected through the [u]ser [f]ee. When the [u]ser [f]ee proceeds meet or exceed the [w]ater [s]upply [c]harge revenue, the [w]ater [s]upply [c]harge must sunset in full."[11]

---

[11] At oral argument, the parties agreed that, in practice, the order requires the District to sunset the water supply charge in full.

The District filed a motion for new trial and to vacate the judgment. The District argued that the trial court erred in its interpretation of the term " 'available' " because it failed to consider the PUC's Decision 17-01-013, which the District contends required the District to apply the user fee proceeds to the District's conservation and mitigation projects. In the District's view, this obligation necessarily prevented the District from applying the user fee revenues to its water supply projects, meaning such funds were not "available" to sunset the water supply charge.

The trial court denied the District's motion in its entirety. The court noted that the PUC has no authority to place such restrictions on the District in light of the California Supreme Court's decision in *District v. PUC* and determined that, even if the PUC had jurisdiction, its Decision 17-01-013 did not place any restrictions on the District's use of user fee revenues.

The District appealed the judgment.

## II. DISCUSSION

The District contends that the trial court erred in overruling the demurrer, asserting that the water supply charge should be considered a " 'special assessment' " as that term was understood when section 118-412 was first adopted in 1977, rather than under the "more precise" definitions later codified in article XIII D of the California Constitution pursuant to Proposition 218. In the alternative, the District argues that the reinstitution of the user fee did not trigger the sunset provision in section 10.C(b) of ordinance 152 because the user fee revenues are not "available" given that the PUC ordered the District to utilize them to fund the District's conservation and mitigation projects.

The Association counters that the water supply charge is a property-related fee, not a special assessment. The Association further contends that the text and legislative history of the ordinance support its conclusion that the District must sunset the water supply charge in light of the reinstitution of the user fee.

12

A. *Applicable Law*

We set out the general legal principles applicable to the two legal questions before us: whether the water supply charge is a special assessment subject to validation proceedings and whether the District must reduce (or eliminate) the water supply charge pursuant to the sunset clause of ordinance 152.

1. Validation Proceedings

Code of Civil Procedure sections 860 through 870 provide for and govern validation actions. "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter." (Code Civ. Proc., § 860.) An " 'interested person' " may also "bring an action challenging the validity of such acts" within the same 60-day period, and such "suits are sometimes referred to as 'reverse' or 'inverse' validation actions." (*Coachella Valley Water Dist. v. Superior Court* (2021) 61 Cal.App.5th 755, 767; see Code Civ. Proc., § 863.) "[I]f the agency does nothing, and no interested person brings a reverse validation action within 60 days, the action is deemed valid and 'become[s] immune from attack.' " (*Coachella*, at pp. 767–768.)

Since "[t]he validation statutes do 'not specify the matters to which [they] appl[y]," we must "look to other statutes to determine the scope of public agency actions that are subject to validation under [Code of Civil Procedure] sections 860 through 870." (*Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 31.) The "other law" at issue here is Water Code Appendix section 118-412, which states that "[a]ny action to determine the validity of any contract, any bonds, notes, or other evidences of indebtedness, or the levy of a special assessment shall be brought pursuant to [c]hapter 9 (commencing with [s]ection 860) of [t]itle 10 of [p]art 2 of the Code of Civil Procedure."

2. Special Assessments, Fees, and Charges under Proposition 218

The term "special assessment" is "sometimes described as a local assessment" (*Solvang Mun. Improvement Dist. v. Board of Supervisors* (1980) 112 Cal.App.3d 545, 552 (*Solvang*)) or a " 'benefit assessment.' " (See, e.g., *Knox v. City of Orland* (1992) 4 Cal.4th 132, 135, fn. 1 (*Knox*).)

Prior to the adoption of Proposition 218, courts defined a "special assessment" as "a charge imposed on particular real property for a local public improvement of direct benefit to that property, as for example a street improvement, lighting improvement, irrigation improvement, sewer connection, drainage improvement, or flood control improvement. The rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public." (*Solvang*, *supra*, 112 Cal.App.3d at p. 552; see also *Knox*, *supra*, 4 Cal.4th at p. 142 [conferring "a special benefit upon the property assessed beyond that conferred generally" is "a critical distinction" with respect to special assessments]; *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 162; *White v. County of San Diego* (1980) 26 Cal.3d 897, 904 ["Property may be specially assessed only for improvements that provide it benefits beyond those received by the public."].)

"Proposition 218, approved by voters in 1996, added articles XIII C and XIII D to the California Constitution and 'is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees.' "[12] (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1021, fn. omitted (*KCSFV*).) " 'Article

---

[12] Proposition 218 " ' "buttresse[d] Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." ' " (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 443 (*Silicon Valley*).)

14

XIII C concerns voter approval for many types of local taxes other than property taxes. Article XIII D addresses property-based taxes and fees.' " (*Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2021) 12 Cal.5th 458, 473 (*Hill*).) Article XIII D prohibits agencies from imposing on properties ad valorem property taxes, special taxes, assessments, and fees or charges for property related services unless the agencies follow specified procedures. (Art. XIII D, § 3, subd. (a); *Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1521; *Paland v. Brooktrails Township Community Services Dist. Bd. of Directors* (2009) 179 Cal.App.4th 1358, 1365 (*Paland*).)

Article XIII D defines " '[a]ssessment' " as "any levy or charge upon real property by an agency for a special benefit conferred upon the real property," and notes that the term " '[a]ssessment' includes, but is not limited to, 'special assessment,' 'benefit assessment,' 'maintenance assessment' and 'special assessment tax.' " (Art. XIII D, § 2, subd. (b).) It defines " '[s]pecial benefit' " as "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large. General enhancement of property value does not constitute 'special benefit.' " (*Id.*, subd. (i).)

"After Proposition 218 became law, the Legislature enacted the Proposition 218 Omnibus Implementation Act [citation] to 'clarify the law so that local governments can adopt budgets for the 1997–98 fiscal year to provide essential local services in compliance with Proposition 218 without needless confusion, duplication of effort, and uncertainty.' " (*Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006, 1013–1014.) Its definition of " '[a]ssessment' " is similar to the definition in article XIII D: "any levy or charge by an agency upon real property that is based upon the special benefit conferred upon the real property by a public improvement or service, that is imposed to pay the capital cost of the public improvement, the maintenance and operation expenses of the public improvement, or the cost of the service being provided. 'Assessment' includes, but is not limited to, 'special assessment,' 'benefit assessment,' 'maintenance

15

assessment,' and 'special assessment tax.' " (Gov. Code, § 53750, subd. (b).) It defines " '[w]ater' " for purposes of article XIII D of the California Constitution as "any system of public improvements intended to provide for the production, storage, supply, treatment, or distribution of water from any source." (Gov. Code, § 53750, subd. (n).)

In contrast to " '[a]ssessment,' " Article XIII D defines " '[f]ee' " or " 'charge' " as "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, *including a user fee or charge for a property related service.*" (Art. XIII D, § 2, subd. (e), italics added.) It defines " '[p]roperty-related service' " as "a public service having a direct relationship to property ownership."[13] (*Id.*, subd. (h).)

Under article XIII D, section 4, an agency seeking to levy an assessment must, among other obligations, "identify all parcels which will have a special benefit conferred upon them and upon which an assessment will be imposed," determine the "proportionate special benefit" each such parcel will receive (*id.*, subd. (a)), calculate the assessment, notify the owners of the affected parcels, provide a ballot to each such owner to allow them to indicate (*id.*, subd. (c)) "his or her support or opposition to the proposed assessment" (*id.*, subd. (d)), conduct a public hearing regarding the proposed assessment, consider all protests against the proposed assessment, and tabulate the ballots. (*Id.*, subd. (e).) "The agency shall not impose an assessment if there is a majority protest," which, in the assessment context, "exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment." (*Ibid.*) Article XIII D, section 4 further provides that, "[i]n any legal action contesting

---

[13] Fees for supplying water are considered fees or charges for property related services. (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1205 (*San Buenaventura*); *Bighorn-Desert View Water Agency v. Verjil, supra*, 39 Cal.4th 205, 215 (*Bighorn-Desert*); *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 426 (*Richmond*); *Wolstoncroft v. County of Yolo* (2021) 68 Cal.App.5th 327, 344 (*Wolstoncroft*); *KCSFV, supra*, 64 Cal.App.5th at p. 1032.)

16

the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." (*Id.*, subd. (f).)

By contrast, "[b]eginning July 1, 1997" (art. XIII D, § 6, subd. (d)), an agency "imposing or increasing any fee or charge" must identify the parcels subject to the fee or charge, calculate the fee or charge, notify the owners of the affected parcels, conduct a public hearing regarding the proposed fee or charge, and consider all protests against the proposed fee or charge. (*Id.*, subd. (a).) "However, no formal balloting is required at this stage of the process." (*Paland*, *supra*, 179 Cal.App.4th at p. 1366.) "If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (Art. XIII D, § 6, subd. (a)(2).) If there is no majority protest, then article XIII D, section 6 of the California Constitution requires voter approval of new or increased fees and charges, "[e]xcept for fees or charges for sewer, water, and refuse collection services." (*Id.*, subd. (c).) This provision of article XIII D does not include corresponding language regarding validation proceedings like that in section 4, discussed *ante*. However, "[b]oth section 4 and section 6 of article XIII D require agencies to identify affected parcels in advance of imposing an assessment or a fee for purposes of providing notice and conducting the required voter approval procedures." (*Paland*, at p. 1371.)

Proposition 218 did not materially alter the interpretation of "special assessment" that had been developed in earlier caselaw. (See *Silicon Valley*, *supra*, 44 Cal.4th at p. 450 ["Both before and after Proposition 218 passed, special assessments were distinguished from special taxes through the concept of special benefits."]; *Ventura Group Ventures, Inc. v. Ventura Port Dist.* (2001) 24 Cal.4th 1089, 1106 (*Ventura Group Ventures*) ["Our decisions prior to [the] adoption [of Proposition 218] were consistent

17

with Proposition 218 in requiring that an improvement that was the subject of a special assessment had to *specially benefit* the assessed property."].)

Following Proposition 218, a special assessment is still an assessment "levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement." (*Ventura Group Ventures*, *supra*, 24 Cal.4th at p. 1106.) However, Proposition 218 clarified the meaning of "special assessment" by adding a definition for " '[s]pecial benefit.' " (Art. XIII D, § 2, subd. (i).) Under Proposition 218, a special benefit must be "conferred on real property located in the district" and clarified that "[g]eneral enhancement of property value does not constitute 'special benefit.' " (*Ibid.*; see also *Silicon Valley*, *supra*, 44 Cal.4th at p. 451.) Our courts have also held that special assessments "must not only confer a special benefit on real property, but also be imposed on identifiable parcels of real property." (*Richmond*, *supra*, 32 Cal.4th at p. 419.)

3. <u>District Law</u>

The District Law does not specifically define the terms "special assessment," "local assessment," "benefit assessment," "fee," or "charge." In the absence of an authoritative definition in the District Law, we consider the context in which the District Law uses the terms. (Code Civ. Proc., § 16.) To the extent the terms have "well-established *legal* meaning[s], [they] will be given [those] meaning[s] in construing the statute." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19; accord Code Civ. Proc., § 16.)

The District Law uses the term "special assessment" in three places, one of which (section 118-412) does not define the term at all. Section 118-436 indicates that a special tax or special assessment[14] must provide a "particular benefit" to the impacted parcels. Section 118-704 likewise specifies that the District may "levy and collect a special tax or

---

[14] Although the provision refers to "special tax or assessment" we understand "special" to modify "assessment" as well as "tax." (See *BondGraham v. Superior Court* (2023) 95 Cal.App.5th 1006, 1019.)

18

assessment upon the real property in" specified or participating zones that receive a "particular benefit" from work a public entity performs on the District's behalf.

The District Law uses the term "benefit assessment" in one provision, section 118-438, which sets forth the procedure for levying a benefit assessment on property within a zone for the purpose of paying for the cost of "works or projects" within such zone. (§ 118-438, subd. (a).) "The amount of the benefit assessment imposed" must be calculated based on the "estimated benefit to the property." (*Id*., subd. (h).)

Section 118-326 authorizes the District "[t]o fix, revise, and collect rates and charges for the services, facilities, or water furnished by it" (§ 118-326, subd. (b)); to contract with a "private or public utility" to collect "charges for any of its services" (*id*., subd. (d)); and "[t]o provide for the collection of the charge and penalties by making the same a lien upon the real property and collectible at the same time and in the same manner as taxes and assessments are so collected upon such real property." (*Id*., subd. (h).) Section 118-308 authorizes the District "to fix and collect" such rates and charges "by resolution or ordinance."

### 4. Ordinance No. 152: Text and Legislative History

The District imposed the water supply charge by adopting ordinance 152 pursuant to its authority under section 118-326. Prior to its adoption, the District made changes to the draft ordinance's original language to address property owners' concerns.

As originally written, the sunset provision of ordinance 152 gave the District discretion over whether and when to sunset the ordinance. A modified text of the ordinance, contained in "handout 3" and distributed at a June 27, 2012 hearing on the draft ordinance, added a more specific sunset provision to the sunset clause. The "specific sunset provision[]" in handout 3 reads: "Notwithstanding any other provision of this [o]rdinance, the District shall not collect a water supply charge pursuant to this [o]rdinance: (a) in [f]iscal [y]ear 2018-19 (or any subsequent fiscal year) if no District project is identified and determined by the [b]oard of [d]irectors to have been underway

19

as of December 31, 2017, (b) to the extent alternative funds are available via a charge collected on the [Cal-Am] bill, or (c) to the extent the [b]oard of [d]irectors determines that the charge (or portion thereof) is no longer required because bonds financing a specific project having been repaid." This provision appeared in the approved version of ordinance 152.

As approved, ordinance 152 stated that its purpose is "to replace and augment the former charge collected by [Cal-Am] on its bills to water customers with a supply charge collected from owners of parcels that receive [water] from the District through [Cal-Am's] distribution system." The ordinance states that the proceeds of the water supply charge "may only be used to fund District water supply activities, including capital acquisition and operational costs for [a]quifer [s]torage and [r]ecovery (ASR) and [g]roundwater [r]eplenishment (GWR) purposes, as well as studies related to project(s) necessary to ensure sufficient water is available for present beneficial water use in the main [Cal-Am] system. In addition to direct costs of the projects, proceeds of this annual water supply charge may also be expended to ensure sufficient water is available for present beneficial use or uses, including water supply management, water demand management, water augmentation program expenses such as planning for, acquiring and/or reserving augmented water supply capacity, including engineering, hydrologic, legal, geologic, financial, and property acquisition, and for reserves to meet the cash-flow needs of the District and to otherwise provide for the cost to provide services for which the charge is imposed."

The sunset provision that appears in the enacted version (section 10) was revised from the original version in the following respects:[15] "**A.** . . . This [o]rdinance shall not have a sunset date, provided however, that ~~fees~~ *charges* set by this [o]rdinance shall not be collected to the extent proceeds exceed funds required to achieve the [p]urposes of this

---

[15] Deletions from the original version are shown in strikethrough. Additions to the original version are shown in bold and italicized typeface.

[o]rdinance . . . . [¶] ***B.*** So long as this annual water ~~use fee~~ *supply charge* is collected, the [b]oard of [d]irectors shall hold a public hearing each calendar year in connection with review of the annual District budget. At that time, the [b]oard shall review amounts collected and expended in relation to the purposes for which the ~~fee~~ *charge* is imposed. The District shall require the annual water ~~use fee~~ *supply charge* to sunset in full or in part unless the [b]oard determines that the purpose of the ~~fee~~ *charge* is still required, and the amount of the ~~fee~~ *charge* is still appropriate ***and less than the proportionate cost of the service attributable to each parcel on which the charge is imposed***. If the purpose ~~expires~~ *is fully accomplished*, the ~~fee~~ *charge* shall be required to sunset. If the purpose for the ~~fee~~ *charge* is determined to continue, but amounts needed to fund that purpose are ~~permanently~~ decreased, the ~~fee~~ *charge* shall be reduced to that lesser amount. . . . [¶] ***C. Notwithstanding any other provision of this [o]rdinance, the District shall not collect a water supply charge pursuant to this [o]rdinance: (a) in [f]iscal [y]ear 2018-19 (or any subsequent fiscal year) if no District project is identified and determined by the [b]oard of [d]irectors to have been underway as of December 31, 2017, (b) to the extent alternative funds are available via a charge collected on the [Cal-Am] bill, or (c) to the extent the [b]oard of [d]irectors determines that the charge (or portion thereof) is no longer required because bonds financing a specific project having been repaid.***"

B. *Analysis*

The District challenges the trial court's characterization of the water supply charge as a "fee" or "charge" rather than a "special assessment." The District also contends the trial court erred in its interpretation of section 10.C(b) of the sunset provision.

We review questions of constitutional and statutory interpretation de novo. (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1013.) " 'Courts interpret municipal ordinances in the same manner and pursuant to the same rules applicable to the interpretation of statutes.' " (*People v. Venice Suites, LLC* (2021) 71 Cal.App.5th 715, 727 (*Venice Suites*).)

21

"We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838 (*Even Zohar*).)  In so doing, we must "keep[] in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)  "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Ibid*.)

" 'If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.' " (*Even Zohar*, *supra*, 61 Cal.4th at p. 838.)  "If the statutory language is susceptible of more than one reasonable interpretation, the courts look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Venice Suites*, *supra*, 71 Cal.App.5th at p. 727.)  " 'We construe the provisions of article XIII D liberally, " 'to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.' " ' " (*Wolstoncroft*, *supra*, 68 Cal.App.5th at p. 342.)

1. Special Assessments

We first address the District's contention that the Association's petition was untimely because it was not filed within 60 days of the District's adoption of its fiscal year 2021-2022 budget, which assumes the continued collection of the water supply charge in an amount similar to prior fiscal years.

The District's argument on this point turns on the nature of the water supply charge.  If it is a "special assessment," then the validation and reverse validation laws would apply pursuant to section 118-412, rendering the Association's petition untimely.

22

By contrast, if the water supply charge is a "fee" or "charge" (and therefore not subject to validation procedures) then the Association's petition was timely filed.

The term " 'special assessment,' " as defined in article XIII D of the California Constitution and later refined in the Proposition 218 Omnibus Implementation Act, means "any levy or charge by an agency upon real property that is based upon the special benefit conferred upon the real property by a public improvement or service, that is imposed to pay the capital cost of the public improvement, the maintenance and operation expenses of the public improvement, or the cost of the service being provided." (Gov. Code, § 53750, subd. (b).) " 'Special benefit' means a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large." (Art. XIII D, § 2, subd. (i).)

The District argues that the trial court erred by not considering the meaning of the term " 'special assessment' " as it was construed at the time the Legislature enacted section 118-412 in 1977. (See *People v. Cruz* (1996) 13 Cal.4th 764, 775 ["The words of a statute are to be interpreted in the sense in which they would have been understood at the time of the enactment."].) Even conceding this general principle of law, the District has not persuaded us that the water supply charge is a "special assessment." Both before and after the passage of Proposition 218, our courts have consistently defined a "special assessment" as a charge levied on real property for a special benefit conferred on the property. (See, e.g., *Solvang*, *supra*, 112 Cal.App.3d at p. 552; *Silicon Valley*, *supra*, 44 Cal.4th at p. 450.) This definition aligns with the usage of the terms " 'special assessment' " and " 'benefit assessment' " in the District Law, which describe them as conferring a "particular benefit" or "benefit" to the properties subject to the assessment.

This interpretation also comports with the definitions of "special assessment" and "local assessment" in Black's Law Dictionary, which defines "special assessment" as "[t]he assessment of a tax on property that benefits in some important way from a public improvement." (Black's Law Dict. (11th ed. 2019) p. 144, col. 2.) It defines "local

23

assessment" and "*local-improvement assessment*" as "[a] tax to pay for improvements (such as sewers and sidewalks) in a designated area, levied on property owners who will benefit from the improvements." (*Ibid.*) In the entry for "assessment for benefits," which we take to refer to "benefit assessments," Black's Law Dictionary refers the reader to the definition of "*special assessment.*" (Black's Law Dict. *supra*, at. p. 144, col. 1.) It defines a "benefit" as "[t]he advantage or privilege something gives" (Black's Law Dict., *supra*, at p. 193, col. 2) and a "special benefit" as "[a] benefit that accrues to the owner of the land in question and not to any others." (*Ibid.*)

We determine that the water supply charge is not a special assessment because the impacted properties do not receive an advantage or privilege that other properties in the District do not also receive; the District supplies water to both impacted and nonimpacted properties (i.e., those connected to the Cal-Am main distribution system and those that are not).

Moreover, the District's own treatment of the water supply charge supports the conclusion that it is not a special assessment. The District adopted the ordinance and instituted the water supply charge in 2012, after the passage of Proposition 218. The District adopted the ordinance in accordance with the procedures set forth in article XIII D, section 6 of the California Constitution, which governs the approval of an agency's fees and charges, rather than the procedures in section 4, which governs the approval of special assessments. Its counsel opined that the water supply charge was a fee or charge under article XIII D of the California Constitution, both in identifying its character and in determining that the District was not obligated to submit ordinance 152 and the water supply charge to a vote.

Ordinance 152, as adopted, uses only the term "charge" to refer to the water supply charge. In addition, the District's meeting agendas and minutes leading up and subsequent to the adoption of the ordinance, as well as its FAQ, all use either the term "fee" or "charge" to refer to the water supply charge. The original draft of ordinance 152

24

referred to the water supply charge as a "fee," and its final version refers to it as a "charge." The foregoing aligns with the District's stated intent that the water supply charge would replace and augment the user fee and its treatment of the two levies as equivalent in nature. Until the court filings in the present dispute, nothing in the record indicates that the District used the term "special assessment" to refer to the water supply charge or considered the charge a special assessment.

The District argues that its use of the term "charge" and "fee" to refer to the water supply charge is not determinative because "[w]hatever it is and by whatever name it may be called, the character of the [water supply charge] 'must be ascertained by its incidents, and from the natural and legal effect of the language employed in the [ordinance].' " (*Ainsworth v. Bryant* (1949) 34 Cal.2d 465, 473.) The District also cites to *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99, 105 for the premise that the nomenclature used by the District "is entitled to some weight, but is not conclusive."

Despite its request for deference, the District's own management of the water supply charge and the function of the water supply charge discussed *post*, taken together, lead us to conclude that the water supply charge is a fee or charge, and not a special assessment. A "special assessment" requires the special benefit, one that is "particular and distinct . . . over and above general benefits" (art. XIII D, § 2, subd. (i)) bestowed on property in the District or to the public, to be conferred upon and specially benefit an identifiable parcel. (*Hill*, *supra*, 12 Cal.5th at p. 474 [" 'An assessment can be imposed *only* for a "special benefit" conferred on a particular property.' "].)

The parcels in question here are identifiable as those properties connected to the Cal-Am main water distribution system. However, the fact that the water supply is directed at specific parcels does not make the water supply charge a special assessment. Property-related services, such as water delivery, are also directed at a "particular parcel or set of parcels" but do not qualify as special assessments. (*San Buenaventura*, *supra*, 3 Cal.5th at p. 1208; *Wolstoncroft*, *supra*, 68 Cal.App.5th at p. 345.)

25

The District does not articulate how the water supply (funded by the water supply charge revenues) constitutes a "special benefit" to the impacted properties, nor does the record or case law support such an interpretation. As the District itself stated, the water supply charge was imposed for the provision of a "property-related service," namely, the supply of water. The District declared the purpose of the water supply charge was to "ensure sufficient water is available for present beneficial use or uses," including by funding the augmentation of its water supply through a variety of methods, such as the ASR and GWR projects. It defines the water supply charge in its budgets as funding water supply "for the general benefit of the District as a whole."

Case law does not support the characterization of supplying water as a "special benefit." Rather, supplying water is an indispensable resource that is " 'an incident of property ownership' because it requires nothing other than normal ownership and use of property." (*Richmond*, *supra*, 32 Cal.4th at p. 427.) Our courts have regularly held that " 'supplying water is a "property-related service" within the meaning of . . . a fee or charge' " under Proposition 218. (*San Buenaventura*, *supra*, 3 Cal.5th at p. 1205; see also *Wolstoncroft*, *supra*, 68 Cal.App.5th at p. 344 ["In a nutshell, 'a public water agency's charges for *ongoing water delivery* . . . are fees and charges within the meaning of article XIII D.' "]; *Bighorn-Desert*, *supra*, 39 Cal.4th at p. 216; *Richmond*, at pp. 426–427; *KCSFV*, *supra*, 64 Cal.App.5th at p. 1032 [" ' "[O]nce a property owner . . . has paid the connection charges and has become a customer of a public water agency, all charges for water *delivery* incurred thereafter are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee." ' "]; cf. *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982, 995–996, italics added [finding a special benefit due to "potential increases in property values from the presence of a reliable public water supply *for fire suppression purposes*"].) A public entity's efforts to "ensur[e] continued water delivery [] constitute[] a fee rather than an assessment." (*Wolstoncroft*, at p. 344.)

26

We decide the trial court did not err in concluding the water supply charge is a "fee" or "charge," rather than a "special assessment." Therefore, the validation statutes do not apply, and the Association's petition was timely filed.

2. Sunset Provision

The District asserts that the user fee revenues are not "available" to supplant the water supply charge because the PUC ordered the District to allocate those proceeds to its conservation and mitigation operating funds. The District further maintains that "whether funds are 'available' for a given purpose is a policy decision not subject to judicial intervention." The Association counters that the user fee revenues became available once the District began collecting them again through Cal-Am and that the PUC's order did not include the requirement asserted by the District. In addition, the Association argues that what is at issue here is not whether the District has the discretion to make budget decisions regarding the allocation of the user fee revenues, but, rather, the legality of the District's continued imposition of the water supply charge, despite the reinstitution of the user fee, under the sunset provision in section 10.C(b) of the ordinance.

We acknowledge that " 'courts exercise limited review of legislative acts by administrative bodies out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority.' " (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667 (*San Francisco Fire Fighters Local 798*).) However, "the level of deference accorded a[n agency's] decision will depend in part on the nature of the challenge to the agency action." (*Ibid*.)

A challenge to an agency's action " 'as inconsistent with the terms or intent of the authorizing statute' " (here, ordinance 152) is a legal question that courts may adjudicate " 'because the courts are the ultimate arbiters of the construction of a statute.' " (*San Francisco Fire Fighters Local 798*, *supra*, 38 Cal.4th at p. 668; *Scott v. Common Council*

27

(1996) 44 Cal.App.4th 684, 697.)  "While the construction of a statute by officials charged with its administration . . . is entitled to great weight, nevertheless, '[w]hatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' " (*Morris v. Williams* (1967) 67 Cal.2d 733, 748.)  In addition, where, as here, "there is no factual dispute, only the question of how [the ordinance] is to be construed and applied, we exercise our independent judgment." (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 304.)

We agree that the District has discretion over its allocation of the user fee revenues, and we do not opine on how it may designate the user fee revenues to its operating funds.  Nevertheless, the District remains subject to the limitations set forth in the sunset provision in ordinance 152.

Section 10.C of ordinance 152 states, in pertinent part:  "Notwithstanding any other provision of this [o]rdinance, the District shall not collect a water supply charge pursuant to this [o]rdinance: . . . (b) to the extent alternative funds are available via a charge collected on the [Cal-Am] bill."

The term "available" is defined as "present or ready for immediate use" (Merriam-Webster Online Dict. 2024 <https://www.merriam-webster.com/dictionary/available> [as of Sept. 11, 2024] archived at <https://perma.cc/P7CP-DU98>, "[a]ble to be used, obtained, or selected; at one's disposal" (Oxford English Dict. Online (2022) <https://www.oed.com/dictionary/available_adj?tab=meaning_and_use#32375135> [as of Sept. 11, 2024], archived at <https://perma.cc/8FZZ-ASFU>, "such as may be availed of: capable for use for the accomplishment of a purpose : immediately utilizable," "that is accessible or may be obtained," or "at disposal especially for sale or utilization." (Merriam-Webster Unabridged Dict. Online (2024) <https://unabridged.merriam-webster.com/unabridged/available> [as of Sept. 11, 2024] archived at <https://perma.cc/W64G-RFKZ>.)

Based on the plain meaning of the term, we conclude that the user fee proceeds are "available" for the District's use. The proceeds are capable of being used and ready for use by the District. The District may decide and has decided, in its discretion, to use such proceeds to fund one or more of its various projects, including its conservation, mitigation, and/or water supply projects, in whole or in part.

The District contends that even though the user fee revenues may be "technically available," they are not "practically available" and the term " 'available' " in section 10.C(b) means the latter, not the former. The District maintains that the user fee revenues are not "practically available" for two reasons: (1) the PUC's mandate in Decision 17-01-013 limits the District's ability to use the user fee revenues, and (2) the District has a discretionary right to "make [u]ser [f]ee revenues unavailable for water supply projects." It contends that both the purported order and the District's "budgetary discretion" allow the District to "determine[] that the purpose of the charge is still required" pursuant to section 10.B of the ordinance.

The District argues that the user fee revenues are not " 'available' " because, pursuant to the PUC's "directive" in Decision 17-01-013, the District must use the user fee revenues to fund its conservation and mitigation projects and, as a result, the District is unable to use those proceeds to fund its water supply projects. The parties agree that the PUC does not have jurisdiction over the District's activities (*District v. PUC*, *supra*, 62 Cal.4th at pp. 699–700), including how the District chooses to allocate the user fee revenues. Nonetheless, the District asserts that, "[e]ven if the PUC lacks authority, it is not without hold-up leverage" and "is not easily resisted."

The District has not persuaded us that the PUC's actions render the user fees revenues unavailable. The PUC's decision does not require the District to use the user fee revenues to fund its conservation and mitigation projects. The order states only that Cal-Am "shall remove the [c]onservation [b]alancing [a]ccount surcharge and the Carmel River [m]itigation [p]rogram [b]alancing [a]ccount surcharge from customer bills within

29

30 days of the required notice via [t]ier 1 advice letter, at the same time the [u]ser [f]ee is placed on the customer bills." Indeed, as part of its order, the PUC required Cal-Am to include a notice in the bills of affected customers, which stated, in pertinent part, "[The District] employs revenues from the [u]ser [f]ee for a variety of programs, including funding its environmental mitigation, *water supply*, conservation and other activities."[16] (Italics added.)

Moreover, the District and Cal-Am filed a joint motion in October 2016 seeking such an order from the PUC. In discussing its strategy for sunsetting the water supply charge earlier that year, in April 2016, the District had proposed that it levy "only a single [District] [u]ser [f]ee [s]urcharge on [the] Cal-Am bill, instead of a mitigation surcharge, a conservation surcharge, and the [u]ser [f]ee," and "[c]apture" "the existing [c]onservation [s]urcharge and [m]itigation [p]rogram expenses" in the District's "[u]ser [f]ee budget."

Further, we infer from the District's own classification of its funds that the District's use of the user fee proceeds is discretionary and not restricted by the PUC's order. The District classifies its funds as either nonspendable, restricted (externally imposed restrictions or restrictions imposed by law), committed (amounts that can only be used for specific purposes due to constraints imposed by the District's board), assigned (amounts constrained by the District's intent to be used for specific purpose but that are neither restricted nor committed), or unassigned (residual classification). Its project expenditures fall in the category of "[a]ssigned," rather than "[r]estricted," governmental funds. This categorization indicates that the District does not consider the

_____

[16] A 2021 decision in which the PUC approved a settlement agreement between Cal-Am and the District likewise indicates that the PUC did not limit the District's use of the user fee revenues in the manner suggested by the District. The order in that decision authorized Cal-Am to continue collecting the user fee on the District's behalf "to support environmental mitigation, water conservation, *and other water service-related programs* that were authorized in Decision 17-01-013." (Italics added.)

revenue it uses to fund its conservation, mitigation, and water supply projects, including user fee revenues, to be subject to "externally imposed" restrictions or restrictions imposed by law, but, rather, subject only to the District's own decision making. The District retains discretion over how it apportions the user fee proceeds. Conversely, the record does not indicate that the PUC required the District to allocate the user fee revenues to fund its conservation and mitigation projects, or pressured it to do so. Rather, the record demonstrates that the PUC deferred to the District to determine how it would use the user fee revenues.

Turning to the text of the ordinance itself, the District argues that sections 10.B and 10.C should be harmonized by reading section 10.B as "a conditional sunset based on an annual review" and section 10.C as the same, "but stated a bit differently, looking to the practical availability of [u]ser [f]ee revenues to fund the water-supply purposes of the ordinance." The District thus maintains that, even though the user fee is "technically available" vis-à-vis the Cal-Am bills under section 10.C(b), the fact that the District is facing "increased costs" and is allocating user fee proceeds to conservation and mitigation projects (whether as required by the PUC order or as the District determines in its discretion) means that "the purpose of the charge is still required" because the remaining user fee revenues after such allocation are not sufficient to fund the District's water supply activities. We are not convinced by the District's argument that section 10.C is "a more specific restatement" that merely "emphasi[zes]" that the water supply charge "would end when unneeded."[17]

---

[17] The District relies on the same argument to counter the trial court's conclusion that the District's interpretation of section 10.C impermissibly creates surplusage, and contends that such purported "restatement" and "[e]mphasis [of section 10.B] is not surplusage." As we discuss *post*, the inclusion of the " 'notwithstanding' " phrase and the absence of discretionary modifiers in section 10.C(b) distinguish it from, rather than render it coextensive with, section 10.B. Moreover, if we were to read section 10.C(b) as the District suggests, as a reiteration of the "general principle" that the water supply

Section 10.C begins with the phrase "Notwithstanding any other provision of this [o]rdinance." The plain language of this phrase precludes the conclusion that section 10.C is a restatement of or subject to section 10.B. "When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like 'notwithstanding any other law' or 'notwithstanding other provisions of law.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 406; *Tan v. Appellate Division of Superior Court* (2022) 76 Cal.App.5th 130, 138; *Klajic v. Castaic Lake Water Agency* (2004) 121 Cal.App.4th 5, 13 ["By use of ['notwithstanding any other law'], the Legislature expresses its intent ' "to have the specific statute control despite the existence of other law which might otherwise govern." ' "].) The introductory phrase "Notwithstanding any other provision of this [o]rdinance" operates to give it precedence over the general, discretionary terms in section 10.B.[18]

When considered in the context of the remainder of section 10.C, the introductory phrase further weakens the District's argument. After the "[n]otwithstanding" introductory phrase, the provision states "the District shall not collect a water supply charge pursuant to this [o]rdinance." The word "shall" indicates that the District has the

_____

charge "would end when unneeded," it would render section 10.C(b) redundant and, thus, violate the canon against surplusage. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 810–811 ["A construction that renders some statutory language surplusage or redundant is to be avoided."].) Furthermore, we would need to ignore the "notwithstanding" phrase—also in violation of the canon against surplusage (*People v. Reynoza* (2024) 15 Cal.5th 982, 991 [" '[W]e generally must "accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' "])—and insert discretionary language that does not exist into that provision. We lack the authority to rewrite the text of the ordinance. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 9.)

[18] For the same reason, we reject the District's reliance on the term "augment" in finding 10 of ordinance 152 to support its argument that the District's discretionary rights under section 10.B must control because "[t]he [w]ater [s]upply [c]harge cannot 'augment' the [u]ser [f]ee if it must sunset when the latter was restored." We decide that the clear language of section 10.C giving it precedence over other provisions of the ordinance trumps any ambiguity introduced by the inclusion of the word "augment" in finding 10.

obligation to cease collection of the water supply charge upon the occurrence of one or more of the listed conditions. (See, e.g., *Wright v. Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177, 181–182.) While subparts (a) and (c) of section 10.C include discretionary language modifying the conditions therein ("determined by the [b]oard of [d]irectors" and "to the extent the [b]oard of [d]irectors determines that the charge (or portion thereof) is no longer required," respectively), no such discretionary language appears in section 10.C(b). Nothing in section 10.C(b) suggests the District has discretion over when its obligation to sunset the water supply charge is triggered. To the contrary, the language of the provision is clear. The District must sunset the water supply charge, in whole or in part, when it begins collecting the user fee again through the Cal-Am water bill.

Although we decide the words of section 10.C(b) of ordinance 152 are themselves clear and unambiguous, our interpretation finds additional support in the legislative history of that provision. Pursuant to meetings with representatives of District property owners, the District reached a compromise that, in part, included the addition of "[s]tronger '[s]unset' [p]rovisions" in section 10.C. The record indicates that the impacted community sought to make the sunset provisions "stronger" by requiring greater certainty and specificity as to when the District would sunset the water supply charge. Handout 3 stated an intent to include "specific sunset provisions." June 25, 2012 meeting notes discussing requested revisions to ordinance 152 documented a request for "a date certain for sunset." In addition, the District's FAQ explaining the terms of ordinance 152 referred to the condition in section 10.C(b) as a separate and absolute limitation on the District's continued collection of the water supply charge.

We conclude that section 10.C was intended to limit—and, in the case of section 10.C(b), eliminate—the District's discretion to override the conditions for sunsetting the water supply charge. We hold that section 10.C requires the District to make a pro rata reduction of the water supply charge for every dollar that is collected through the user

fee.  Based on the record before us and discussed *ante* (pt. I.A.), the user fee proceeds exceed the water supply charge proceeds.  Therefore, we decide the District must sunset the water supply charge in its entirety.

### III.  DISPOSITION

We affirm the trial court's judgment.  Respondents are awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
                                Danner, J.


WE CONCUR:




_____
Bamattre-Manoukian, Acting P. J.




_____
Bromberg, J.


**H051128**
*Monterey Peninsula Taxpayers' Assoc. v. Monterey Peninsula Water Management District*